

FILED
Jul 05 2017, 8:21 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Daniel D. Bobilya
Conor S. Slocum
Bonahoom & Bobilya, LLC
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEES

John J. Thar
Dustin J. Moloy
Katzman & Katzman, P.C.
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

401 Public Safety and Lifeline
Data Centers, LLC,

*Appellants-Defendant,*

v.

David Ray and the Committee to
Elect David Ray,

*Appellees-Plaintiff*

July 5, 2017

Court of Appeals Case No.
49A02-1609-PL-2132

Appeal from the Marion Superior
Court

The Honorable John F. Hanley,
Judge

Trial Court Cause No.
49D11-1511-PL-37914

**Baker, Judge.**

[1] 401 Public Safety (401) and Lifeline Data Centers, LLC (Lifeline) (collectively, the Appellants), appeal the trial court's order dismissing their defamation complaint against David Ray and the Committee to Elect David Ray (the Committee) (collectively, the Appellees) based on the Anti-SLAPP Statute.[1] Finding no error, we affirm.

# Facts[2]

[2] 401 is an Indiana limited liability company that owns a portion of what used to be the Eastgate Mall, located on North Shadeland Avenue in Indianapolis (the Property). Lifeline is an Indiana limited liability company that leases a portion of the Property. Alex Carroll is the managing member of both 401 and Lifeline; it is unclear whether Carroll also has an ownership interest in the companies. Carroll, through Lifeline, supported the campaign of Ben Hunter, who was the incumbent City-County Councilman running against Ray.

[3] In 2010 and 2013, Lifeline made political contributions of $800 and $500, respectively, to Hunter's campaign committee; at that time, Hunter was a member of the Indianapolis City-County Council. On May 20, 2011, 401 entered into a twenty-five-year lease agreement (the Lease) with the City of Indianapolis (the City), pursuant to which 401 leased a portion of the Property to the City. Hunter strongly advocated in favor of the Lease. The portion

[1] Ind. Code ch. 34-7-7 et seq. SLAPP is an acronym for Strategic Lawsuits Against Public Participation.

[2] We held oral argument in Indianapolis on April 27, 2017. We thank counsel for their able written and oral presentations.

leased by the City is commonly referred to as the "Regional Operations Center" (ROC).

[4] Beginning in September 2013, the Indianapolis media began investigating and reporting about the physical state of the property that housed the ROC. Specifically, there were media reports that the building was unfit and unsafe for people to work in. In 2014, media reports indicated an ongoing City-County Council investigation into the Lease, which was described as a bad deal for the City and its taxpayers. Carroll admitted to receiving notices of violation from the City.

[5] Ray is a lifelong resident of the east side of Indianapolis. In 2015, Ray ran as a candidate for the office of the 19th District of the Indianapolis City-County Council. The Committee was established to assist with Ray's campaign, and Ray served as the Committee's chairperson.

[6] Tim Henderson volunteered as a general consultant for Ray's campaign. Henderson conceptualized a series of flyers to be mailed to eastside constituents. The third flyer (the Flyer), which is the subject of this litigation, can be described as follows:

- The first side contains reproductions of two reports of the 2010 and 2013 contributions made by Lifeline to Hunter's campaign committee.
- That side states, "What will $1,300 from a political insider buy? A contract with the City. A contract Ben Hunter pushed for. On November 3rd vote NO to sweetheart deals for political insiders."
- Additionally, that side includes two media quotations. First, from FOX-59 on September 12, 2013, "Contract for ROC locks city into 25-year

deal." Second, from the *Indianapolis Star* on September 13, 2013, "The [ROC] is in Hunter's district, and Hunter was a champion of the project. He filled committee meetings with supporters and organized a public campaign to send emails to council members."

- The text on the second side is superimposed over a photograph of the Property.

- The second side contains the following original text: "When it came to protecting the Eastside's interests, Ben Hunter let us down. Ben Hunter cut a sweetheart deal for a political insider. A deal that cost the city millions and ties up the former Eastgate site for 25 years. Code enforcement violations. Fire and safety hazards. Investigations. Lawsuits. A building so unsafe, it was evacuated. It's a mess. A mess that the Eastside is left to clean up. Vote David Ray for City-County Council on November 3rd."

- Additionally, the second side includes two media quotations, both from the same September 13, 2013, *Indianapolis Star* article. First, "The building was so dangerous that the fire department placed it on 'fire watch,' which meant a fire marshal had to be on the premises 24 hours a day to handle any emergency." Second, "'I cannot have people in this facility that is deemed unsafe,' Riggs[3] said."

Appellees' App. Vol. II p. 2-3. At no point does the Flyer mention or implicitly refer to 401.

[7] On November 13, 2015, 401 and Lifeline filed a defamation complaint against Ray and the Committee based solely on the Flyer. On February 12, 2016, Ray and the Committee filed an answer and affirmative defenses, including an affirmative defense based on the Anti-SLAPP Statute. On June 6, 2016, Ray and the Committee filed a motion to dismiss based, in relevant part, on the

---

[3] At that time, Troy Riggs was the acting Public Safety Director of Indianapolis.

Anti-SLAPP Statute. Following briefing and a hearing, on August 23, 2016, the trial court entered an order summarily granting the motion to dismiss based on the Anti-SLAPP Statute. Lifeline and 401 now appeal.

# Discussion and Decision

## I. Standard of Review

[8] As required by the Anti-SLAPP statute, the trial court treated the motion to dismiss as a motion for summary judgment, and we must do the same. Ind. Code § 34-7-7-9(a)(1); *see also Shepard v. Schurz Commc'ns, Inc.*, 847 N.E.2d 219, 224 (Ind. Ct. App. 2006) (acknowledging a conflict between the burden of proof in the Anti-SLAPP statute and Trial Rule 56 and concluding that the conflict must be resolved in favor of the statute). Our standard of review on summary judgment is well established:

> We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp,* 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (internal citations omitted).

*Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). Under the Anti-SLAPP statute, the trial court should grant the motion if it finds that the movant has

proved by a preponderance of the evidence that the act on which the claim is based is a lawful act in furtherance of the person's constitutional right of petition or free speech. I.C. § 34-7-7-9.

# II. The Anti-SLAPP Statute

The Anti-SLAPP statute protects a person's right of free speech under the federal and state constitutions "in connection with a public issue or an issue of public interest[.]" I.C. § 34-7-7-1. The statute provides as follows:

> It is a defense in a civil action against a person that the act or omission complained of is:
>
> (1)     an act or omission of that person in furtherance of the person's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Indiana in connection with a public issue; and
>
> (2)     an act or omission taken in good faith and with a reasonable basis in law and fact.

I.C. § 34-7-7-5.

The Anti-SLAPP statute is intended to reduce the number of lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. *Hamilton v. Prewett*, 860 N.E.2d 1234, 1241-42 (Ind. Ct. App. 2007). To reduce the number of lawsuits brought to chill speech, a defendant who prevails on a motion to dismiss under the Anti-SLAPP statute is entitled to recover reasonable attorney's fees and costs. I.C. § 34-7-7-7.

Finally, the Anti-SLAPP Statute does not "supplant the Indiana common law of defamation," but requires the person raising the defense to establish that his speech was "lawful." *Shepard*, 847 N.E.2d at 224 (citing I.C. § 34-7-7-9(d)).

> To establish a claim of defamation, a plaintiff must prove the existence of "'a communication with defamatory imputation, malice, publication, and damages.'" "[T]he actual malice standard of proof required in defamation cases involving matters of public or general concern applies not only to public figures, but to private individuals as well." This is so because, "in most instances, there is little disparity in the ability of private versus public individuals to obtain access 'to the channels of effective communication' in order to 'counteract false statements'" and because "'[a] citizen . . . assume[s] the risk of media comment when he becomes involved . . . in a matter of general or public interest.'" Actual malice exists when the defendant publishes a defamatory statement "'with knowledge that it was false or with reckless disregard of whether it was false or not.'"

*Id*. at 224-25 (internal citations omitted).

## A. Public Issue

Speech is a matter of public concern within the context of the Anti-SLAPP statute "if it is addressed to 'any matter of political, social, or other concern to the community,' as determined by its content, form, and context." *Brandom v. Coupled Prods., LLC*, 975 N.E.2d 382, 386 (Ind. Ct. App. 2012) (quoting *Love v. Rehfus*, 946 N.E.2d 1, 10 (Ind. 2001)). The *Brandom* Court found a California court's analysis of this issue to be instructive:

> "[There are] three non-exclusive and sometimes overlapping categories of statements that have been given anti-SLAPP

protection. The first category comprises cases where the statement or activity precipitating the underlying cause of action was 'a person or entity in the public eye.' The second category comprises cases where the statement or activity precipitating the underlying cause of action 'involved conduct that could affect large numbers of people beyond the direct participants.' And the third category comprises cases where the statement or activity precipitating the claim involved 'a topic of widespread, public interest.' Courts have adopted these categories as a useful framework for analyzing whether a statement implicates an issue of public interest and thus qualifies for anti-SLAPP protection."

975 N.E.2d at 385 (quoting *Cross v. Cooper*, 197 Cal. App. 4th 357, at 373 (Cal. Ct. App. 2011)) (internal citations omitted). The *Brandom* Court explained that an issue of public interest can be defined as broadly as "any issue in which the public is interested . . . and the issue need not be 'significant' to be protected by the Anti-SLAPP statute." 975 N.E.2d at 385.

[13] We have little difficulty concluding that the speech at issue here was made in connection with a public issue. The Flyer was mailed in the context of a contested political election and raised issues related to a large, formerly dilapidated and unsafe building in Indianapolis, taxpayer dollars, political donations received by the incumbent candidate, and a twenty-five-year lease to which the City was a party for which the incumbent strongly advocated. The Lease had been the subject of inquiries by the City-County Council and multiple media outlets for years before the Flyer was mailed. The public, particularly the citizens and voters in the 19th District, had an undeniable interest in all these issues. In fact, we believe that these issues likely fit into all

of the three categories set forth above. Consequently, we find that the trial court did not err by concluding that the Appellees met their burden of establishing that the speech at issue related to a matter of public concern.

## B. Without Malice, In Good Faith, and With Reasonable Basis in Law and Fact

[14] In the context of defamation law, "good faith" has been defined as "'a state of mind indicating honesty and lawfulness of purpose; belief in one's legal right; and a belief that one's conduct is not unconscionable.'" *Nexus Grp., Inc. v. Heritage Appraisal Serv.*, 942 N.E.2d 119, 122 (Ind. Ct. App. 2011) (quoting *Owens v. Schoenberger*, 681 N.E.2d 760, 764 (Ind. Ct. App. 1997)).

> Bad faith, then, appears to require, regardless of truth or falsity, a statement the speaker "knew . . . was false or entertained serious doubts as to its truth"; even if the speaker is "motivated by self-interest," a statement might not be in bad faith if the speaker "genuinely believed that he was being factual and also believed that it would be best for his community" to pursue the subject matter of the statement.

*Id.* at 123.

[15] "Actual malice exists when the defendant publishes a defamatory statement 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Shepard*, 847 N.E.2d at 225 (citations omitted).

> Actual malice is not an objective standard of reasonableness; rather, it is a subjective standard that requires one challenging the speech, . . . , to prove by clear and convincing evidence that the speaker "'in fact entertained serious doubts as to the truth of his

publication,' or acted with a 'high degree of awareness of . . . probable falsity.'" A speaker is not required to verify facts before speaking unless she has some reason to doubt the veracity of those facts. The actual malice standard protects those negligent or careless false statements of fact that are inevitable in free debate.

*Brandom*, 975 N.E.2d at 390 (internal citations omitted).

[16] First we will consider these issues with respect to 401. The Flyer never once mentions 401. It contains a photograph of a building that, in the end, 401 admitted was not even its building. Appellants' App. p. 220. Instead, it is a photograph of the building that used to be Eastgate Mall, which is partly owned by 401. We cannot believe that a viewer of the Flyer would draw any connection between 401 and the content of the Flyer. In other words, we cannot conclude that the Flyer contained a single even arguably defamatory or untrue statement with respect to 401; consequently, the Appellees could not have acted with actual malice by including a photograph of a building that is not, in fact, 401. The trial court did not err by granting summary judgment with respect to 401.

[17] Next, we must turn to Lifeline and each of the statements contained in the Flyer. First, there are reproductions of two reports of the 2010 and 2013 contributions made by Lifeline to Hunter's campaign committee. There is no dispute that these are true and accurate reproductions. Because the reproductions are true and accurate, there is no malice in their inclusion.

Second, the Flyer contains four media quotations. The Appellants make no claim that these quotations are false or inaccurate; and each quotation includes the date on which it was published.[4] As a result, we can only conclude that the Appellees acted in good faith and with a reasonable basis in fact when including these statements on the Flyer.

Third, the Flyer states as follows: "What will $1,300 from a political insider buy? A contract with the City. A contract Ben Hunter pushed for. On November 3rd vote NO to sweetheart deals for political insiders." Appellees' App. Vol. II p. 2-3. As noted above, it is true that Lifeline—which is managed by Carroll—donated $1,300 to Hunter's campaign. It is also true that Hunter then strongly advocated for and "champion[ed]" the Lease between 401—also managed by Carroll—and the City. *Id.* at 108. While it may be true that the implication that Lifeline "bought" Hunter's assistance in procuring the Lease with the City goes a step farther, we do not find that step sufficient to undermine a conclusion that the Appellees acted in good faith and with a reasonable basis in fact in making these statements on the Flyer.

Fourth, the Flyer makes the following statements:

> When it came to protecting the Eastside's interests, Ben Hunter let us down. Ben Hunter cut a sweetheart deal for a political

---

[4] The Appellants argue that the articles constitute inadmissible hearsay, but the articles were not designated to prove the truth of the matter asserted therein. Instead, they were designated to show that the quotations on the Flyer were accurate and that the Appellees acted in good faith and had a reasonable basis in fact for the statements made on the Flyer. Therefore, this argument is unavailing.

insider. A deal that cost the city millions and ties up the former Eastgate site for 25 years. Code enforcement violations. Fire and safety hazards. Investigations. Lawsuits. A building so unsafe, it was evacuated. It's a mess. A mess that the Eastside is left to clean up. Vote David Ray for City-County Council on November 3rd.

*Id.* Again, each of these statements is either true or an opinion. These issues were investigated and reported on by several reputable Indianapolis media outlets and were the subject of a City-County Council inquiry. It is undisputed that the Lease cost the City millions of dollars and had a term of twenty-five years; it is undisputed that the City notified 401 of code violations, that the Property was considered to be a fire and safety hazard, and that the building was evacuated. The Appellants argue that the safety issues have all been cleaned up since 2014, but because a politician's past actions are always relevant to current political campaigns, we do not find that to be an important distinction. The fact that these statements are true means that the trial court properly concluded that the Appellees acted in good faith and with a reasonable basis in fact.

[21] The Appellees' designated evidence establishes that the Appellees sent a series of five mailers to potential voters to help introduce Ray to the electorate and call into doubt Hunter's record. There is no evidence that their intent was malicious; instead, they mailed the Flyer as part of a hotly-contested political campaign. *See Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 456 (Ind. 1999) (holding that a defendant's actual state of mind is a critical factor in

determining whether he was acting with malice).  They intended to question *Hunter's* political record, but there is no evidence that they intended to harm Lifeline.  In other words, the evidence establishes that they did not act in bad faith or with actual malice.

[22]  In sum, we find that the speech contained in the Flyer constitutes a matter of public interest and that the Appellees have established as a matter of law that they acted in good faith, without malice, and with a reasonable basis in law and fact.  Therefore, the trial court properly granted summary judgment in their favor.

[23]  The judgment of the trial court is affirmed.


Kirsch, J., concurs.
Mathias, J., concurs in part and dissents in part with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| 401 Public Safety and Lifeline Data Centers, LLC, | Court of Appeals Case No. 49A02-1609-PL-2132 |
| *Appellants-Defendant,* | |
| v. | |
| David Ray and the Committee to Elect David Ray, | |
| *Appellees-Plaintiff.* | |

**Mathias, Judge, concurring in part and dissenting in part.**

[24] I agree with the majority's conclusion that the speech at issue in this appeal relates to a matter of public concern. I also agree that the trial court properly granted summary judgment to the Appellees with respect to 401 Public Safety. However, I do not agree with the majority's conclusion that the Appellees established as a matter of law that they acted in good faith and with a reasonable basis in law and fact with respect to Lifeline Data Centers.

[25] "[A] State has a legitimate interest in upholding the integrity of the electoral process." *Brown v. Hartlage*, 456 U.S. 45, 52 (1982). Importantly, "the free exchange of ideas provides special vitality to the process traditionally at the heart of American constitutional democracy — the political campaign." *Id*. at 52-53.

[26] Presumably, a candidate for public office does not enter into the fray lightly, but rather, armed with the knowledge that he or she may be attacked by a political opponent in print, television, and social media. In addition, this case demonstrates that a private company or individual who made a prior campaign contribution to a candidate or politician can be involuntarily thrown into the fray as well. In our current political climate, impugning the integrity of a private company or individual is unfortunately considered fair game.

[27] Politicians can be held accountable for publishing dishonest statements to the public with actual malice, i.e. "with knowledge that it was false or with reckless disregard of whether it was false or not." *See Shepard v. Schurz Communications, Inc. et. al*, 847 N.E.2d 219, 225 (Ind. Ct. App. 2006). Requiring political campaigns to refrain from publishing defamatory statements does not have a chilling effect on responsible freedom of speech.

[28] Turning to the facts in this appeal, the designated evidence established that Ray did not know who owned the former Eastgate Mall site when the flyer was sent to his constituents. Appellant's App. Vol II, p. 106. Henderson, Ray's campaign consultant who created the flyer, admitted that Lifeline's donations to Hunter's

campaign had no impact on Hunter's decision to support the City's lease of a portion of the former Eastgate Mall site. Appellant's App. Vol. III, pp. 242, 248. Lifeline did not have a lease with the City, but the flyer implies that Lifeline did have a contract with the City, and the contract was obtained by donating money to Ben Hunter's campaign. When considered as a whole, the flyer also implies that Lifeline was responsible for the dangerous condition of the building.

[29] After reviewing the flyer and other designated evidence, I would conclude that whether Ray made the statements in the flyer without actual malice and in good faith is a genuine issue of material fact that must be resolved by the fact finder. I would therefore reverse the trial court's entry of summary judgment for Ray with respect to Lifeline's claims.