FILED

Apr 23 2019, 8:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

James E. Ayers
Wernle, Ristine & Ayers
Crawfordsville, Indiana

ATTORNEYS FOR APPELLEES

Robert B. Thornburg
Maggie L. Smith
Frost Brown Todd LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kevin Pack,<br>*Appellant-Plaintiff,*<br><br>v.<br><br>Truth Publishing Company, Inc.,<br>and John S. Dille III,<br>*Appellees-Defendants.* | April 23, 2019<br><br>Court of Appeals Case No.<br>18A-PL-1742<br><br>Appeal from the Elkhart Superior<br>Court<br><br>The Honorable Kristine A.<br>Osterday, Judge<br><br>Trial Court Cause No.<br>20D01-1701-PL-15 |

**Najam, Judge.**

## Statement of the Case

Kevin Pack appeals the trial court's entry of summary judgment for the Truth Publishing Company and John S. Dille III, the owners of *The Elkhart Truth* newspaper (collectively, "the Newspaper"). The trial court entered summary judgment after the Newspaper moved to dismiss Pack's defamation complaint

under Indiana's Strategic Lawsuit Against Public Participation Act, Ind. Code §§ 34-7-7-1 to -10 (2018) ("the Anti-SLAPP statutes"). Pack raises five issues for our review,[1] which we consolidate and restate as the following two issues:

1. Whether the Newspaper's publication was in connection with a public issue.

2. Whether the Newspaper's publication was taken in good faith and with a reasonable basis in law and fact.

[2] We affirm.

## Facts and Procedural History[2]

[3] In August of 2013, Kevin Pack, an atheist, began teaching German at Northridge High School ("NHS") in Middlebury on a probationary contract. Shortly after beginning his employment, Pack became the subject of various complaints by parents, students, and faculty. The complaints alleged that Pack had used profanity in class and had utilized films and literature that contained sexual content. Additionally, students alleged that Pack's lack of respect, organization, and guidance made it difficult to learn. Other NHS employees

---

[1] Pack's brief on appeal appears to be premised on the elements of his defamation claim rather than showing whether the Newspaper designated evidence to establish an affirmative defense under the Anti-SLAPP statutes, which has made the merits of his arguments on appeal difficult to discern. Further, several of Pack's arguments on appeal appear to relate to damages. As the Newspaper points out, those arguments do not, even if true, "defeat application of the Anti-SLAPP" statutes. Appellees' Br. at 40.

[2] We held oral argument on March 28, 2019, in the Indiana Court of Appeals courtroom.

also complained of Pack's tardiness and absences from school and school functions.

[4] On February 24, 2014, Gerald Rasler, NHS's principal, issued to Pack a "Notice of Preliminary Decision of Immediate Cancellation of Contract." Appellant's App. Vol. II at 33. That notice cited Pack's alleged "immorality, insubordination, neglect of duty, and other just cause" as reasons to support the immediate cancellation of Pack's contract. *Id.* On February 28, Pack requested a private conference with Jane Allen, NHS's superintendent. Following that conference, Allen recommended the termination of Pack's contract to the Board of Trustees of Middlebury Community Schools ("the School Board"), and Pack requested a hearing with the School Board.

[5] On April 1, the School Board held a hearing at which Pack and his union representative were present. The next day, the School Board terminated Pack's employment. The School Board explained its decision with more than seventy findings of fact, which included the following findings:

> 19. Mr. Pack showed a movie titled "Lola Rennt" ("Run Lola Run") to his Level One (1) German class, made up primarily of freshmen and sophomores who are under the age of seventeen (17).
>
> 20. "Lola Rennt" is rated R in the United States.
>
> 21. "Lola Rennt" features scenes which represent two (2) individuals engaging in sadomasochism. The individuals are wearing tiny leather costumes. The male is pictured bent over a

sofa, wearing nothing but a dog collar and a leather thong. The female is wearing leather lingerie while holding the male on a leash and winding up to strike him with a whip.

22. "Lola Rennt" contains multiple spoken swear words, including "F[**]k," "F[*****]g B[***]h," "D[**]n," and "S[**]t."

23. Several students expressed concerns to building level administrators and [to] their parents about struggles with their command of the German language due to a lack of review/lack of proper teaching methods to become familiar with the German language . . . .

24. Students expressed that they felt disrespected by Mr. Pack[] because he laughs at students' answers.

25. Students mentioned that Mr. Pack will occasionally yell or get angry if a student does not know the correct answer to a question.

26. Students reported that Mr. Pack will occasionally interrupt the students, sometimes with a comment that is irrelevant to what is being discussed in class.

* * *

28. Students complained that Mr. Pack's lack of organization and guidance often made it difficult to follow what was happening in class.

29. Students stated that the curriculum is confusing[] because they are never sure what they are going to learn in class or when to take notes.

30. Students stated that Mr. Pack has created a negative atmosphere where many students do not plan on taking future German classes at NHS.

* * *

36. Several students complained that Mr. Pack tests and quizzes them over topics never covered in class.

37. Students stated that Mr. Pack occasionally leaves the classroom during student presentations.

38. Several students stated that Mr. Pack has used swear words in front of students, using the words "F[**]k" and "G[*]d D[**]n."

39. Students stated that Mr. Pack told the class an inappropriate Jewish joke during a lesson over the Holocaust.

40. Several students stated that they received A's and/or A+'s for work which they had never completed.

41. Several students complained that Mr. Pack loses students' work.

42. Several students complained that[,] when Mr. Pack gave the semester final exam, he allowed the students to grade their own exams. This exam was a common assessment that was required by NHS to be given to all Level Two (2) German students. The results of this exam were used to assess how well the students were performing in German class.

43. Parents expressed concern to Mr. Rasler that their children had fallen behind and would like a plan for those of Mr. Pack's students who would like to continue taking German . . . with another teacher.

44. Parents expressed concern to Jane Allen that their children had asked their permission to drop plans of taking future German classes due to their experiences in Mr. Pack's class.

45. Parents stated that they were forced to purchase Rosetta Stone German . . . for their children's supplemental studies due to their lack of progress in Mr. Pack's class.

* * *

50. On December 10, 2013, students brought a book down to [another NHS German teacher's] classroom titled (in German), something along the lines of "All the German You Were Never Taught in School." The book featured nude drawings, foul language, and sexual content (even involving animals). The students said that Mr. Pack had pointed the book out to them at the beginning of the year and leaves it out for perusal on his counter. . . .

* * *

58. On December 12, 2013, several students reported getting the mid-term exam with answers given to them.

*Id.* at 34-38 (citations omitted). Based on those and other findings, the School Board concluded as follows:

> 1. Based on the statements of fact[], Mr. Pack's actions constitute immorality.
>
> 2. Based on the statements of fact[], Mr. Pack's actions constitute insubordination.
>
> 3. Based on the statements of fact[], Mr. Pack's actions constitute neglect of duty.
>
> 4. Based on the statements of fact[], other just cause justifies the immediate cancellation of Mr. Pack's Contract.

*Id.* at 40.

[6] Following its decision to terminate Pack's employment, the School Board authorized a press release to explain its decision. The press release stated that Pack "d[id] not meet [the School Board's] expectations" of being "proficient and try[ing] to do [his] best when educating our students." *Id.* at 43. The press release further stated that Pack was "a poor teacher[] whose overall performance regressed throughout the school year and showed no potential for improvement." *Id.*

[7] On January 15, 2015, Pack filed a lawsuit against the Middlebury School Corporation in federal district court in which he alleged that his employment had been terminated, in violation of his federal rights, based on his atheism. Jeff Parrott, a reporter for the Newspaper, learned of Pack's federal complaint soon thereafter. He then reviewed Pack's filings in the federal court and the School Board's press release. He also requested the School Board's findings

from Allen pursuant to Indiana's Access to Public Records Act, I.C. §§ 5-14-3-1 to -10 ("APRA"), and Allen provided him with those findings. Parrott further interviewed Pack and Allen, and he received a written statement from Pack's attorney.

[8] On January 24, the Newspaper published on its website an article authored by Parrott and entitled, "Fired Northridge teacher, an atheist, sues Middlebury Community Schools for religious discrimination." Appellant's App. Vol. II at 25. The article discussed the events leading up to Pack's termination and Pack's resulting federal lawsuit. The second sentence of the article stated that "the school corporation maintains it fired German teacher Kevin Pack for insubordination, immorality[,] and *incompetence.*" *Id.* (emphasis added).

[9] After the article's publication, Pack contacted Parrott and asserted that Parrott had incorrectly used the term "incompetence" as that specific word had not been recited by the School Board as one of its four reasons for terminating Pack's employment. Pack further informed Parrott that "incompetence" as it relates to the termination of a high school teacher has a specialized meaning, and Parrott's use of the word in an online article would make it harder for Pack to find reemployment. However, despite Pack's request, the Newspaper refused to retract its use of the word "incompetence" as it related to the termination of Pack's employment at NHS.

[10] Pack then sued the Newspaper for defamation. In particular, he asserted that the article incorrectly challenged his competence as a teacher, that the

Newspaper "knew [the use of that word] to be untrue," and that, in using that word, the Newspaper "calculated" that it would "cause great injury" to Pack. *Id.* at 15. In response, the Newspaper moved to dismiss Pack's complaint under the Anti-SLAPP statutes.

[11] The trial court directed the parties to engage in discovery on the Newspaper's motion. Thereafter, the Newspaper designated the following evidence in support of its motion: the online article; an affidavit by Parrott; and an affidavit by Allen, to which she had attached the School Board's findings in support of its termination decision as well as the press release. In his affidavit, Parrott stated:

> In writing the Article, I interviewed Pack and . . . Allen and received an email statement from Pack's attorney . . . . I also reviewed the documents filed with the Court in Pack's federal lawsuit, [the School Board's] Findings of Facts and Conclusions [terminating Pack's employment,] and the Press Release . . . .

*Id.* at 46-47. And, in her affidavit, Allen stated that she gave the School Board's findings to Parrott "[i]n response to [his APRA] request . . . ." *Id.* at 31.

[12] Pack designated his own affidavit as well as the affidavit of James A. Tucker, an expert on secondary education and employment. Tucker stated in relevant part as follows:

> 12. Any press release by [a] school corporation [explaining a teacher's dismissal] requires specificity. It is thereby[] the obligation of the press to accurately restate and relay the specifics for the stated reasons of a teacher's dismissal. . . . Reasons for

dismissal are given in the language of the statute. This language is not open to interpretation from the press or generalizations of a reporter, such as Parrott's thoughts and interpretations . . . .

* * *

14. The Middlebury School Corporation Superintendent[, Allen,] was wrong to release the confidential [findings] determined by the Board for Pack's dismissal to Parrott, the reporter. But that release provides concrete and specific proof of the reasons for the dismissal. Parrott did not quote the reasons as stated. His article uses the term, incompetence. By so doing, Parrott has placed on the "web" as factual that Pack was dismissed for a specific statutory reason that was no[t] listed. As a result, any potential employer who googles Pack's name will see from that article that Pack was found by the Board to be, and therefore, is an incompetent teacher. It displays to any potential employer that Mr. Pack is incompetent as so proven by Middlebury School Corporation.

* * *

16. . . . Since incompetence takes on a special meaning in the dismissal of any teacher, only the facts should be disseminated to the public. . . . Middlebury School Corporation did not find him to be incompetent, it did not seek to have Pack's teaching license revoked. . . .

* * *

18. As a result of Parrott's article, in my opinion, Mr. Pack's teaching career is over. It is just as catastrophic as though the school corporation had sought and obtained revocation of Pack's teaching license, which there is no basis in the Board's records to

support. Educators do not view "incompetence" the same as "neglect of duty." Being late for class, or entering by the wrong door is not incompetence, it is neglect of duty. Middlebury School Corporation made that conscious distinction by not using the term, incompetence.

* * *

24.    . . . Parrott is an educated and experienced man, [and] it is my belief that he knew exactly what he was writing and the ramifications of that writing. Had Parrott quoted the school corporation materials, he would not have written the article in such a way as to declare Pack to be incompetent. It is not the place or right of the press to use language different than that which they are given by the school corporation, if that language has a specific meaning and is harmful to the person, and the reporter understands and intentionally writes such language. . . .

*Id.* at 83-87.

[13]    After receiving the parties' designated evidence and holding a hearing, the trial court entered summary judgment for the Newspaper under the Anti-SLAPP statutes. This appeal ensued.

# Discussion and Decision

## *The Anti-SLAPP Statutes and Our Standard of Review*

Indiana's Anti-SLAPP statutes apply "to an act in furtherance of" a person's[3] "right of . . . free speech . . . in connection with a public issue or an issue of public interest . . . ." I.C. § 34-7-7-1(a). The statutes provide:

> a defense in a civil action against a person that the act or omission complained of is:
>
> > (1) an act or omission of that person in furtherance of the person's right of . . . free speech . . . in connection with a public issue; and
> >
> > (2) an act or omission taken in good faith and with a reasonable basis in law and fact.

I.C. § 34-7-7-5. Thus, the Anti-SLAPP statutes create an affirmative defense. To demonstrate that defense, the moving party must show: (1) that its complained-of act "was in furtherance of the person's right of . . . free speech";[4] (2) that the act "was in connection with a public issue"; and (3) that the act "was taken in good faith and with a reasonable basis in law and fact." *Gresk ex rel. Estate of VanWinkle v. Demetris*, 96 N.E.3d 564, 569 (Ind. 2018) (citations and quotation marks omitted).

---

[3] "Person" under the Anti-SLAPP statutes includes "[a]ny . . . legal entity." I.C. § 34-7-7-4.

[4] There is no dispute in the instant appeal that the Newspaper's publication of the article was an act in furtherance of the Newspaper's right of free speech.

[15]     Where, as here, a civil defendant moves to dismiss a pleading under the Anti-SLAPP statutes, the trial court "shall . . . [t]reat the motion as a motion for summary judgment" and establish an expedited schedule for discovery and argument on that motion.  I.C. § 34-7-7-9(a).  As our Supreme Court has made clear:

> [w]e review summary judgment *de novo*, applying the same standard as the trial court:  "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)).  "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences."  *Id.* (internal citations omitted).

> The initial burden is on the summary-judgment movant to "demonstrate [ ] the absence of any genuine issue of fact as to a determinative issue," at which point the burden shifts to the non-movant to "come forward with contrary evidence" showing an issue for the trier of fact.  *Id.* at 761-62 (internal quotation marks and substitution omitted).  And "[a]lthough the non-moving party has the burden on appeal of persuading us that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that he was not improperly denied his day in court."  *McSwane v. Bloomington Hosp. & Healthcare Sys.*, 916 N.E.2d 906, 909-10 (Ind. 2009) (internal quotation marks omitted).

*Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014) (omission and some alterations original to *Hughley*). Summary judgment in Indiana is an intentionally "high bar" that "consciously errs on the side of letting marginal cases proceed to trial on the merits[] rather than risk short-circuiting meritorious claims." *Id.* at 1004.

Pack asserts that the trial court erred when it entered summary judgment for the Newspaper under the Anti-SLAPP statutes for two principal reasons. First, he asserts that the Anti-SLAPP statutes do not apply here because the Newspaper's publication of the article was not in connection with a public issue. He also asserts that the designated evidence creates a genuine issue of material fact as to whether the Newspaper's publication of the article was taken in good faith and with a reasonable basis in law and fact. We address each of Pack's arguments in turn.

### Issue One: Whether the Newspaper's Publication of the Article was in Connection with a Public Issue

We first address Pack's assertion that "[t]his is a not a SLAPP situation" because no public issue is involved. Appellant's Br. at 12. Our Supreme Court has held that "speech is in connection with a matter of public concern if it is addressed to any matter of political, social, or other concern to the community, as determined by its content, form, and context." *Gresk*, 96 N.E.3d at 571 (quotation marks omitted). In *Gresk*, the court held that the Anti-SLAPP statutes did not apply to a physician's report of child abuse to the Indiana

Department of Child Services ("DCS") because that report was premised on the physician's legal obligations, not "any intent to facilitate debate." *Id.* at 569-70.

[18] The Newspaper's designated evidence in support of its motion under the Anti-SLAPP statutes shows that its publication of the article addressed a matter of concern to the local community. In particular, the content, form, and context of the article demonstrate that the Newspaper published it to inform the community of a federal lawsuit filed against a local public school corporation, which lawsuit alleged that the school corporation had engaged in religious discrimination. As such, the Newspaper's designated evidence established a *prima facie* showing that its publication of the article was in connection with a public issue.

[19] In response, Pack asserts that a genuine issue of material fact exists as to whether the publication was in connection with a public issue for three reasons. First, he asserts that the publication was not in connection with a public issue because about nine months had passed between Pack's termination from NHS and the Newspaper's publication of the article. But Pack's federal lawsuit against the Middlebury School Corporation, not his termination from NHS, was the impetus for the article, which the Newspaper published less than ten days after Pack had filed his federal lawsuit. Pack's termination from NHS was simply context in the article for his federal lawsuit. Accordingly, we reject Pack's first argument.

[20]   Second, Pack asserts that the Newspaper's publication of the article was not in connection with a public issue because, according to Pack, in writing the article Parrott relied in part on confidential information, namely, the School Board's findings. We also reject this argument. Although we explain in Issue Two that Pack has failed to show on appeal that the School Board's findings were confidential here, for purposes of whether the Newspaper published the article in connection with a public issue we need only note that whether the findings were or were not confidential is irrelevant. That is, whether Parrott relied on any confidential information in writing the article is neither here nor there with respect to whether the Newspaper's publication of the article was in connection with a public issue. *Cf. New York Times Co. v. United States (Pentagon Papers)*, 403 U.S. 713, 714 (1971) (per curiam) (permitting the publication of classified information). Thus, this argument is a nonstarter.

[21]   Third, Pack asserts that the Anti-SLAPP statutes do not apply because the facts here are analogous to those in *Gresk*. But we do not see any meaningful comparisons between the instant facts and the facts in *Gresk*. In *Gresk*, our Supreme Court held that a physician's legally mandated report of suspected child abuse to DCS was not a report protected by the Anti-SLAPP statutes. 96 N.E.3d at 569-70. Nothing about a newspaper's publication of an article regarding a federal religious-discrimination lawsuit against a local public school corporation is on par with the facts of *Gresk*, and we reject Pack's argument accordingly. Hence, we hold that Pack failed to rebut the Newspaper's showing that its publication of the article was in connection with a public issue.

### Issue Two: Whether the Newspaper's Publication was Taken in Good Faith and with a Reasonable Basis in Law and Fact

[22] We thus turn to whether the designated evidence demonstrates as a matter of law that the Newspaper's publication was taken in good faith and with a reasonable basis in law and fact. "In the context of defamation law, 'good faith' has been defined as a state of mind indicating honesty and lawfulness of purpose; belief in one's legal right; and a belief that one's conduct is not unconscionable." *401 Pub. Safety v. Ray*, 80 N.E.3d 895, 900-01 (Ind. Ct. App. 2017) (citing *Nexus Grp., Inc. v. Heritage Appraisal Serv.*, 942 N.E.2d 119, 122 (Ind. Ct. App. 2011)), *trans. denied*. That standard can be shown by evidence that demonstrates that the Newspaper "did not entertain serious doubt regarding the truth" of its article; that the Newspaper "believed that the statements and opinions expressed in it were fair and reasonable" at the time of its publication; and that, in writing the article, the Newspaper based its information on "reliable sources." *CanaRx Servs., Inc. v. LIN Television Corp.*, 2008 WL 2266348, at *7 (S.D. Ind. 2008).

[23] On the other hand, our Supreme Court has identified five scenarios in which the evidence will not demonstrate good faith:

> (1) where a story is fabricated by the defendant; (2) where the story is the product of defendant's imagination; (3) where the story is based wholly on an unverified anonymous telephone call; (4) where the defendant's allegations are so inherently improbable that only a reckless person would have put them in circulation; and (5) where there are obvious reasons to doubt the

> veracity of the informant or the accuracy of the informant's
> reports.

*Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 462 n.27 (Ind. 1999) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).

[24] We hold that the Newspaper's designated evidence established a *prima facie* showing that its publication of the article was taken in good faith and with a reasonable basis in law and fact. There is no dispute that, in writing the article, Parrott spoke to Pack and received an email statement from Pack's attorney. *See* Appellant's App. Vol. II at 88-89. Parrott's affidavit also states that, in writing the article, he spoke to Allen; he relied on the School Board's publicly available press release; he relied on the School Board's findings, which he had obtained by way of an APRA request; and he relied on Pack's filings in the federal district court. In other words, Parrott based the article on reliable sources; the article was not fabricated, the product of Parrott's imagination, based on unverified anonymous sources, or based on sources wholly lacking in credibility.

[25] The School Board's press release, on which Parrott relied in part, stated that Pack had been terminated from his employment at NHS because Pack was not "proficient" and was "a poor teacher[] whose overall performance regressed throughout the school year and showed no potential for improvement." *Id.* at 43. And the School Board's numerous findings, on which Parrott also relied in part and which were also designated to the trial court by the Newspaper

without objection, provided numerous examples that supported the School Board's summary in the press release.

[26] The Newspaper had no reason to and did not entertain serious doubts regarding the truth of its article. Indeed, the Newspaper had no reason to reach any conclusion other than the conclusion that the statements and opinions expressed in the article were fair and reasonable. "Incompetence" commonly means the "lack of ability to do something successfully or as it should be done." *Incompetence*, Cambridge Advanced Learner's Dictionary & Thesaurus, *available at* https://dictionary.cambridge.org/us/dictionary/english/incompetence (last visited April 16, 2019). The School Board's press release expressly said that Pack had not been proficient, and "incompetence" is a well-accepted antonym for "proficient." *E.g.*, Roget's Int'l Thesaurus 317, 319 (6th ed. 2001).

[27] Parrott's use of the word "incompetence" fairly characterized and summarized the School Board's findings and decision to terminate Pack's employment. And there was nothing about Parrott's use of that word in the context of Pack's termination "so inherently improbable that only a reckless person would" have used that word. *See Journal-Gazette*, 712 N.E.2d at 462 n.27. The School Board's detailed findings underlying its termination decision support Parrott's use of that word in writing the article. Accordingly, the Newspaper's designated evidence in support of its motion under the Anti-SLAPP statutes established a *prima facie* showing that its publication of the article was taken in good faith and with a reasonable basis in law and fact.

[28]     Nonetheless, Pack asserts that his designated evidence creates a genuine issue of material fact as to whether the Newspaper's publication of the article was taken in good faith and with a reasonable basis in law and fact for three reasons. First, Pack asserts that the Newspaper lacked a reasonable basis in law to publish the article because the Newspaper should have known that the School Board's findings were confidential. Pack likewise asserts that a reasonable fact-finder could infer that the Newspaper's publication of an article premised at least in part on confidential information shows a lack of good faith.

[29]     Pack's first argument assumes and then turns on the purported confidentiality of the School Board's findings underlying its termination of Pack's employment.[5] But Pack has not demonstrated in this appeal that the School Board's findings were confidential, either as a matter of fact or as a matter of law.[6] Indeed, as noted above, the impetus for the article was Pack's federal

---

[5] The Newspaper asserts on appeal that Pack's arguments regarding the confidentiality of the School Board's findings were not raised in the trial court and, thus, are not available for appellate review. We disagree. At the hearing in the trial court on the Newspaper's motion under the Anti-SLAPP statutes, Pack argued that Parrott's reliance on apparently confidential materials in writing the article created a genuine issue of material fact as to whether the Newspaper had acted in good faith and with a reasonable basis in law and fact when it published that article. Tr. at 22-23.

However, at the oral argument before our Court, Pack for the first time appeared to suggest that Parrott could not have relied on the School Board's findings because those findings would not be admissible at trial. Insofar as Pack's argument here is that the admissibility, or not, of the findings goes to the question of good faith, that argument has not been preserved for our review. Similarly, insofar as Pack's argument here is that the trial court erred in permitting the Newspaper to designate the School Board's findings in support of its motion under the Anti-SLAPP statutes, Pack did not object to that designation in the trial court and, thus, he may not raise that issue for the first time on appeal.

[6] We need not decide in this appeal whether as a matter of law the School Board's findings were confidential, but we note that Pack cites no authority for his proposition that they were. Instead, he cites Indiana Code Section 20-28-3-0.5, but that statute says only that "teacher evaluation results . . . [are] confidential and exempt from disclosure" under APRA. However, the School Board's findings were issued pursuant to the termination proceedings described in Indiana Code Sections 20-28-7.5-1 to -3, which

lawsuit in which he had alleged religious discrimination in the termination of his employment, and Parrott relied in part on Pack's federal filings in writing the article. In other words, whether or not the School Board's findings in terminating Pack's employment were confidential, Pack put those findings at issue when he sued the Middlebury School Corporation for unlawful termination of his employment. Parrott's reliance on the School Board's findings thus does not create a genuine issue of material fact as to whether the Newspaper's publication of the article was taken in good faith and with a reasonable basis in law and fact. To the contrary, it only reinforces the Newspaper's showing that Parrott acted with reasonable diligence in writing the article.

[30] Second, Pack asserts that Tucker's affidavit creates a genuine issue of material fact as to whether the Newspaper's publication of the article was in good faith when Parrott characterized and summarized the underlying documents from the School Board. In particular, in his affidavit Tucker stated that Parrott had no "right" to put the School Board's findings into Parrott's own words. Appellant's App. Vol. II at 87. Tucker similarly stated that a local school corporation's press releases are "not open to interpretation from the press or generalizations of a reporter," and that Parrott was required to simply "quote[] the school corporation materials." *Id.* at 83-84, 87. Tucker also said that he thought Parrott "knew exactly what he was writing and the ramifications of

decisions are to be "evidenced by a signed statement in the minutes of the board" at the board's next "public meeting" after the hearing with the teacher whose employment has been terminated. I.C. § 20-28-7.5-3.

that writing" in doing so. *Id.* at 87. In other words, Tucker appears to challenge Parrott's state of mind.

[31] But Tucker is not competent to testify to Parrott's state of mind. Tucker does not identify himself as having any experience as a journalist or training in journalism. *See id.* at 80-87. As such, he is in no position to comment on Parrott's professionalism as a journalist. *See* Ind. Evidence Rules 701, 702. Tucker's opinions as to how a journalist should do his job would not be admissible evidence at trial and, thus, we will not consider them on summary judgment. *See, e.g.*, *Reeder v. Harper*, 788 N.E.2d 1236, 1240 (Ind. 2003) (citing Ind. Trial Rule 56(E)). We reject Pack's second argument.

[32] Third, and last, Pack asserts that the Newspaper's refusal to retract the use of the word "incompetence" when confronted with the alleged mistake and its potentially adverse impact on Pack's employment opportunities infers the Newspaper did not act in good faith. But Pack's after-the-fact analysis is not relevant. The act at issue is the Newspaper's initial publication of the article and whether that initial publication was in good faith. After-the-fact information that could not have played any part in the Newspaper's initial publication decision does not matter to that analysis. Thus, we conclude that Pack's designated evidence fails to rebut the Newspaper's *prima facie* showing that its publication of the article was taken in good faith and with a reasonable basis in law and fact.

# Conclusion

[33]    In sum, we hold that the Newspaper's designated evidence established a *prima facie* showing that it was entitled to judgment as a matter of law under the Anti-SLAPP statutes, and Pack's designated evidence failed to create a genuine issue of material fact.  Accordingly, the trial court properly entered summary judgment for the Newspaper, and we affirm the trial court's judgment.

[34]    Affirmed.


Mathias, J., and Altice, J., concur.