


FILED

May 08 2024, 9:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Mark Campbell,

*Appellant-Plaintiff/Counter Defendant*

v.

Andrew Campbell and
Campbell Research & Consulting, LLC,

*Appellees-Defendants/Counter Plaintiffs*

---

May 8, 2024

Court of Appeals Case No.
23A-CT-2178

Appeal from the Hendricks Superior Court

The Honorable Robert W. Freese, Judge

Trial Court Cause No.
32D01-2301-CT-25

---

**Opinion by Judge Vaidik**
Judges May and Kenworthy concur.

**Vaidik, Judge.**

## Case Summary

[1] Mark Campbell sued his son, Andrew Campbell, for defamation and false light invasion of privacy after Andrew alleged in a book and on social media that Mark committed domestic violence against Andrew's mother decades earlier when he was growing up. Andrew moved to dismiss Mark's complaint under Indiana's anti-SLAPP (Strategic Lawsuit Against Public Participation) statute. Under this statute, defendants may invoke the anti-SLAPP defense when faced with a civil action for acts or omissions in furtherance of their right of petition or free speech under the federal and state constitutions "in connection with a public issue." The trial court dismissed Mark's complaint, and he now appeals.

[2] While domestic violence is of general public interest, that does not make every allegation of domestic violence a newsworthy event, particularly when, as here, the allegations concern private conduct by private individuals and attract no public interest on their own. Because Andrew has failed to prove that his statements were made in connection with a public issue, the anti-SLAPP defense does not apply. The trial court erred in dismissing Mark's complaint. We therefore reverse and remand.

## Facts and Procedural History

[3] Mark was married to Andrew's mother, Patsy, from 1983 until 2004. Andrew was born in 1984. Andrew was nineteen years old when Mark filed for divorce and twenty when the divorce was finalized. After the divorce, there were

periods of estrangement between Mark and Andrew. In 2012, Andrew, who was in his late twenties, sent a handwritten letter to Mark in which he explained that he felt abandoned by Mark's separation from Patsy and that Mark had chosen his parents over him. *See* Appellant's App. Vol. III p. 31. Andrew wrote, "When you left our home I lost not only the presence of my father but the feeling of safety and security which only a father can provide" and "I have often wondered if things would have been different had you not moved back in with your parents but stayed closer to us." *Id.* at 31-32. Andrew also emailed Mark, reiterating that he felt "abandoned" when Mark moved in with his parents and explaining that the intent of his communications was not to "hurt" Mark but to be "honest" with him. *Id.* at 30.

[4] After obtaining bachelor's and master's degrees, Andrew sought to build a career in domestic-violence research. In 2018, he founded Campbell Research and Consulting. Soon after, IndyStar published an article about domestic violence that featured Andrew. The article explained that Andrew witnessed an incident in 2013 that "change[d] the course of his life and his work." *Id.* at 37. According to the article, "A woman, bruised and bleeding, was on her back on the ground. A man stood over her threatening further abuse." *Id.* Andrew called 911 and stayed with the woman until police arrived.

[5] In 2021, Mark became aware that Andrew had begun describing himself "as a survivor of family violence and [Mark] as the perpetrator of that family violence" in a book he had written and on social media. *Id.* at 27. In September 2021, Andrew published a book titled *Not Without My Pet: Understanding the*

*Relationship Between Victims of Domestic Violence and Their Pets* (Freiling Publishing, 1st paperback ed.). The preface to the book is called "My Own Victimization and the Origins of my Passion for this Work" and provides, in part:

> I have decided to share a brief history of my own experiences in this area to help the reader understand the origins of my passion for this work.

> I remember, at the age of fourteen, waking up to my mother distraught and crying on the floor in the doorway of my bedroom. I would not wish seeing someone you love harmed, as deeply as she had been for so long, on anyone. My father stood over me as I started out of bed and simply said, "Take care of your sister, I'm leaving." He forcefully stepped over my mom and walked out the door. He had pulled this stunt several times before, most likely intended to further assert control.

> \* \* \* \*

> I slept little for the next ten years. It was common for me to be continuously checking doors and windows throughout my house in the middle of the night and early morning hours. I knew not what my dad was capable of, and feared harm would come if I fell asleep.

Appellant's App. Vol. II pp. 79-80, 81. Andrew also made the following posts on social media (Twitter and LinkedIn):

> "In youth I feared every night that my dad would break into my home to kill my mom . . . ."

"I didn't want 'no contact' with my dad, not because it was what was best for me, but because the 'system' failed us and it was my only way to keep 'tabs' and ascertain current risk level for harm to my mom at his hands."

"Many nights from ages 14 to 23 I would be sitting outside until 3 in the morning afraid this might be the night my father would 'snap' & come for my Mom. [My dog] sat out there with me every single time, licking the tears from my eyes."

"I told my mom at 14, please don't let my dad back in this house. I wanted separation from the obvious harm. Court order was used to ensure we had to keep seeing him anyway. Now that contact has FINALLY stopped I get the chance to start to heal at 38 that I should have gotten at 14."

Appellant's App. Vol. III pp. 41, 43, 44. Andrew also gave presentations during which he made similar allegations. *Id.* at 27.

[6] In January 2023, Mark filed a complaint against Andrew and Campbell Research and Consulting (collectively, "Andrew") for defamation and false light invasion of privacy. Andrew counterclaimed for abuse of process. Andrew later moved to dismiss Mark's complaint under Indiana's anti-SLAPP statute, Indiana Code chapter 34-7-7. The parties then conducted discovery for purposes of Andrew's anti-SLAPP motion to dismiss.

[7] In support of his motion to dismiss, Andrew designated the complaint and answer, his book, and his affidavit. According to Andrew's affidavit:

6. Throughout periods of my childhood, I observed and became aware of acts of domestic violence by Mark against my mother.

7. Throughout periods of my childhood and adulthood, I have suffered substantive emotional distress and trauma as a result of Mark's acts of domestic violence against my mother . . . .

Appellant's App. Vol. II pp. 66-67.

[8] Mark opposed the motion to dismiss and designated his affidavit, portions of Andrew's deposition, Andrew's letter and email, the IndyStar article, Andrew's social-media posts, and Andrew's book. In his affidavit, Mark averred that although there was "disagreement, argument, and conflict" toward the end of his marriage to Patsy, he was "never physically, sexually, emotionally, or verbally abusive toward Patsy or [his children] at any time, before, during, or after [his] divorce from Patsy." Appellant's App. Vol. III p. 26. Mark also averred that, contrary to one of Andrew's social-media posts, "[n]o court order was ever requested or entered requiring my children to spend time with me" (as Andrew was an adult when Mark filed for divorce). *Id.* As for the incident Andrew described in the preface to his book, Mark claimed that it "never happened":

There was never an incident where Patsy was screaming and crying on the floor of Andrew's room and I did not ever step over her in such a state, violently or otherwise.

*Id.* at 28.

[9] In the designated portions of Andrew's deposition, Andrew acknowledged that Mark had never physically abused his mother. Rather, he claimed that Mark did so "emotionally and psychologically." *Id.* at 76; *see also id.* at 142 (reiterating

that he has no memory of Mark threatening to harm his mother). When asked about the incident he described in the preface to his book, Andrew explained his memory as follows:

> Again, this is based on my memory of what I remember of where it starts was my dad standing over me saying -- the message was take care of your sister. I believe that was the exact words, take care of your younger sister. Take care of your sister. My mom was crying. She was laying on the floor in my bedroom there in front of the door. My dad walked over to her, and I described it as a violent step over because if she had raised up, he would have trucked right through her. Again, I'm not saying that was his intent, but it certainly would have happened.

*Id.* at 77. Andrew stated that before this incident, he recalled Mark being "mean" to his mother:

> Prior to that I had already witnessed in terms of hearing his abuse of her at night. That had been for quite some period of time. I remember thinking of it as bullying, being mean.

*Id.* at 80. When Andrew was asked if he could recall any specific statements that Mark had made to his mother, he could not. *Id.* at 83.

[10] The trial court granted Andrew's motion to dismiss Mark's complaint, and Mark now appeals.

## Discussion and Decision

[11] Mark appeals the trial court's grant of Andrew's motion to dismiss his complaint under Indiana's anti-SLAPP statute. Our review of such a dismissal

is de novo, applying the same standard as the trial court and considering only the evidence designated in the trial court. *401 Pub. Safety & Lifeline Data Ctrs., LLC v. Ray*, 80 N.E.3d 895, 899 (Ind. Ct. App. 2017), *trans. denied*; Ind. Code § 34-7-7-9(c).

[12] "Public participation is fundamental to self-government, and thus protected by the Indiana and United States Constitutions." *Gresk for Est. of VanWinkle v. Demetris*, 96 N.E.3d 564, 566 (Ind. 2018). The Indiana Supreme Court has recognized that, as early as the 1970s, "ordinary individuals were being sued for simply speaking out politically." *Id.* at 568. "These lawsuits implicitly challenged free speech or petition rights and sent the message that there was a 'price' for civic engagement." *Id.* That "price" was "a high-dollar retaliatory lawsuit—a meritless attempt at chilling participation in government." *Id.* These lawsuits eventually became known as SLAPP—Strategic Lawsuits Against Public Participation. *Id.* "The defining goal of these lawsuits was not to win, but to silence opposition with delay, expense and distraction." *Id.* (quotation omitted); *see also Mellowitz v. Ball State Univ.*, 221 N.E.3d 1214, 1222 (Ind. 2023) ("SLAPP suits are baseless suits intended to stifle constitutionally protected speech by burying—or threatening to bury—those expressing opposing viewpoints under crushing litigation expense and burdens."), *reh'g denied*.

[13] To reduce this abusive litigation, Indiana adopted its anti-SLAPP statute in 1998. *Gresk*, 96 N.E.3d at 568. Defendants may invoke the anti-SLAPP defense when faced with a civil action for acts or omissions in furtherance of their right of petition or free speech under the federal and state constitutions "in

connection with a public issue or an issue of public interest." I.C. § 34-7-7-1. Once an anti-SLAPP motion to dismiss is filed, discovery is stayed except as necessary to respond to the issues raised in the motion. I.C. §§ 34-7-7-6, -9(a)(3). In addition, the motion must be ruled on in an expedited manner. I.C. § 34-7-7-9(a)(2).

[14] "SLAPPs can be difficult to identify." *Gresk*, 96 N.E.3d at 569. But for the anti-SLAPP defense to apply, the requirements of Indiana Code section 34-7-7-5 must be satisfied:

> It is a defense in a civil action against a person that the act or omission complained of is:
>
>> (1) an act or omission of that person in furtherance of the person's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Indiana in connection with a public issue; and
>>
>> (2) an act or omission taken in good faith and with a reasonable basis in law and fact.

The person filing the motion to dismiss bears the burden of proving these requirements by a preponderance of the evidence. *See* I.C. § 34-7-7-9(d). Thus, in order to prove that the anti-SLAPP defense applies here, Andrew must establish that the act or omission complained of was (1) in furtherance of his right of petition or free speech; (2) in connection with a public issue; and (3) taken in good faith and with a reasonable basis in law and fact.

Mark does not dispute that Andrew's statements were in furtherance of his free-speech rights. He argues, however, that Andrew failed to prove that his statements were "in connection with a public issue."[1] In *Gresk*, our Supreme Court addressed, for the first time, "what is or is not a 'public issue' under Indiana's anti-SLAPP statute." 96 N.E.3d at 571. The Court determined that speech is "in connection with a public issue" if it is addressed to "any matter of political, social, or other concern to the community, as determined by its content, form, and context." *Id.* (quotation omitted). In setting forth this "guide," the Court specifically rejected a broad interpretation of the term "public issue" and instead directed courts to "analyze the narrow statements at issue, avoiding a sweeping view of what is 'public.'" *Id.*[2]

Mark acknowledges that domestic violence, in general, is a topic of public interest. He claims, however, that "[t]here is no public interest whatsoever in the question of whether or not Mark, undeniably a private figure, committed domestic violence and abuse against his wife, also a private figure, in their marital home more than 20 years ago." Appellant's Br. p. 15. In support of his argument, he directs us to *Gresk*. There, Dr. Cortney Demetris, a pediatrician specializing in child abuse, made a report to the Indiana Department of Child

---

[1] Mark also challenges the third requirement, but given our resolution of this issue, we need not address that requirement.

[2] Andrew cites *401 Public Safety*, 80 N.E.3d 895, which in turn cites a California case, *Cross v. Cooper*, 197 Cal. App. 4th 357 (2011), for three categories of cases that have been given anti-SLAPP protection. He claims that the statements at issue here "fall squarely within the second and third categories." *See* Appellees' Br. pp. 23-24. But in *Gresk*, our Supreme Court explicitly declined to adopt these categories. 96 N.E.3d at 571 n.10.

Services (DCS) that A.V. was a victim of "medical child abuse." *Gresk*, 96 N.E.2d at 566. A.V.'s parents filed a medical-malpractice complaint against Dr. Demetris, alleging that her diagnosis of medical child abuse fell below the standard of care. Dr. Demetris moved to dismiss the complaint under Indiana's anti-SLAPP statute. The trial court granted the motion to dismiss, but our Supreme Court reversed:

> While child abuse in certain instances may be an issue of public interest, it is not in this case. Here, the form of Dr. Demetris's report was confidential, including content specific to one minor, A.V., and potential abuse by her parents. We agree with Dr. Demetris that child abuse reporting is of general public interest and, indeed, to further that interest the legislature has provided immunity to those who report. But that does not make every report a newsworthy event, particularly when the substance of the report is confidential and concerns a private matter. *See Hamilton v. Prewett*, 860 N.E.2d 1234, 1248 (Ind. Ct. App. 2007)[, *trans. denied*]. Thus, based on the narrow content, form, and context of this report—medical child abuse of one child—it was not a matter of public concern.

*Id.* at 571.

[17] There are no doubt differences between *Gresk* and this case, most notably that in *Gresk* the doctor made a statutorily required and confidential report of child abuse to DCS. But the Court's holding on whether the report was made in connection with a public issue did not turn on whether the report was statutorily required and confidential. Rather, the Court's holding was more broad: while child-abuse reporting is of "general public interest," a report stemming from a "private matter" that "one child" is the victim of abuse is not.

The same goes for domestic violence. As Mark notes, "Certain cases of domestic violence—where the perpetrator or victim are in the public eye, for example, or where an alleged incident of domestic violence attracts public attention or is considered newsworthy—will undoubtedly fall within the Anti-SLAPP statute's protection." Appellant's Br. p. 18.

[18] *Daly v. Nexstar Broadcasting, Inc.*, 542 F. Supp. 3d 859 (S.D. Ind. 2021), though not a domestic-violence case, is a good illustration of this point. There, Derek Daly, a motorsports commentator and former racecar driver, sued a broadcasting company for defamation for running a story on WISH-TV about his "use of the N-word during a live interview." *Id.* at 867. The broadcasting company moved to dismiss the defamation claim under Indiana's anti-SLAPP statute. A federal district court found that Daly's "use of the N-word" was a public issue. *Id.* It reasoned that Daly had "enjoyed several decades of success and notoriety" and was so well known that "strangers recognize him on the street." *Id.* at 868. In addition, when the story broke, it dominated the airwaves and even caught the attention of a vice-presidential candidate. *Id.*; *see also Stabosz v. Friedman*, 199 N.E.3d 800, 809 (Ind. Ct. App. 2022) (noting it was undisputed that the speech at issue was made in connection with a public issue under the anti-SLAPP statute because it involved an elected county auditor making accusations that the county attorney had engaged in illegal and unethical behavior), *trans. denied*; *401 Public Safety*, 80 N.E.3d at 900-01 (concluding the speech at issue was made in connection with a public issue under the anti-SLAPP statute because it concerned a contested political election

and taxpayer dollars); *Hamilton*, 860 N.E.2d at 1248 (explaining the anti-SLAPP defense has been successful in cases where "plaintiffs were attempting to silence media coverage of newsworthy events").

[19] This case does not involve someone in the public eye or a newsworthy event. Andrew's statements concerned private conduct by private individuals and attracted no public interest on their own besides through Andrew's publicization of them in his book (which has garnered only $800 to $1,200 in sales), social-media posts, and speaking engagements. We agree with Mark that a person can't turn private conduct by private individuals into a public issue simply by communicating it to a large number of people. *See Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1133 (2003). If communication of private conduct by private individuals, by itself, were enough, it would give a sweeping view of what is a "public issue," which our Supreme Court has rejected. *See id.* ("If the mere publication of information in a union newsletter distributed to its numerous members were sufficient to make that information a matter of public interest, the public-issue limitation would be substantially eroded, thus seriously undercutting the obvious goal of the Legislature that the public-issue requirement have a limiting effect."). Given the content, form, and context of Andrew's statements, he has failed to establish that they were made in connection with a public issue.

[20] Because Andrew has failed to prove that the anti-SLAPP defense applies, we reverse the trial court's dismissal of Mark's complaint and remand this case to

the trial court to continue the litigation of Mark's claims and Andrew's counterclaim.

Reversed and remanded.

May, J., and Kenworthy, J., concur.

ATTORNEY FOR APPELLANT

Guy S. DiMartino
Guy S. DiMartino, PC
Michigan City, Indiana

ATTORNEYS FOR APPELLEES

William O. Harrington
Bradley L. Riley
Harrington Law, P.C.
Danville, Indiana